First case is Kalmurray v. Barnhart, counsel. Your Honor, I have the pleas of court. Harvey Grad for the appellant. Please proceed. Your Honor, obviously, are we limited to ten minutes? There was a question about what... Yes. Okay. Let me try to be brief. I've outlined it in my memoranda. I want to give a gestalt of the case and accept any questions and reserve some time. This case shouldn't be here. I have my own personal view on it, but I will try to address the legal issue. My client was injured on April 3rd of 1992, went to a 1995 hearing, reversed by the appeals counsel because the judge would not accept the law of the circuit. There was an M.A. who said he met 105C, the listings, because of a back injury. The treating doctor, there were two doctors, Dr. Brown who did the surgery, Dr. Tullis, who then was a follow-up doctor and the primary doctor. This Dr. Tullis then indicated that he doubted this gentleman could do any kind of work. He had bowel and bladder control problems. He had a back injury. The M.A. at the hearing said he had epidural scarring or epidural fibrosis, which would cause a problem and called it a failed back. It was reversed. It came back. They called the V.E. The V.E. said there were certain jobs he could do. He picked specific jobs. Every one of those jobs was a job to which I sent a questionnaire to a one. Every employer sent back and said this job does not exist as proposed by the V.E. There were people that testified on behalf of this individual. His next-door neighbor is a Jorgensen. I think on the second hearing, the husband came in, and the first hearing, the wife wrote and said, look, he's there. We've observed him when he doesn't see us. He's in chronic pain. We're doing his chores for him. The testimony was that this individual would be by the M.A. at the first hearing would be better off, you know, like or more comfortable if he was laying down. He's going to be uncomfortable in any one particular position. The ALJ, and I'm looking for my notes to find the exact page, but the ALJ basically said he finds the rules for lay individuals to be problematic. He did not want to follow them. He did not want to follow the circuit rules. It got to the appeals council the second time they affirmed. It went to the district court. The commissioner conceded error. The commissioner conceded there was no substantial evidence on the record. The case should have been reversed to put this man in pay. He has since died. The case has been assumed by his daughter. I guess I can ask the commissioner the same question. Did the commissioner concede error that there was no substantial evidence or that the wrong standard was applied and that the lay evidence was improperly disregarded? I think they accepted. I was looking through my materials. My belief was that they concluded. I think I was reading from a quote from what the R&R said, that they concluded that there was no substantial evidence to support the commission was my recollection. The second issue was they've asked now to go back and have a third bite at the apple. They cite from the Seavey case. It's kind of strange. The Seavey case is from the First Circuit. The Seavey case would suggest relying on other authority, which is disparate from our standards in this circuit. It would suggest that we shouldn't have some wholesale or automatic reversals. But the Varney, Gamer, Bonnell cases, the trilogy of cases regarding credibility that flows through Regenitor and a number of other cases has chronically said you've got to give specific reasons for denying a witness credibility. Mr. Gratt, isn't the standard we review for abuse of discretion, when the district court remands it, your client hasn't lost. The district court has just said there was some error. It ought to go back. And the Social Security commissioner has got to look at it again, or an ALJ has got to make some findings. And my understanding is that's reviewed for abuse of discretion, not de novo. Now, I hope I can find a spot in my brief, but I cited to that particular issue in the brief, and I pointed out that besides Harmon, which I think is one of the cases cited, that the – and I apologize if I can't take you to that point immediately, and I'll flip and look through it or try to resolve it on rebuttal. But if the Court makes an error of law, that would be an abuse of discretion. We say it's an error of law for this reason. But the Court's saying remand it to correct the errors. What's the error? The error is that the district court is making. The error that the district court makes is that once you have this information that supports the disability, and it's based on testimony or evidence that is blatantly disregarded by an ALJ who has every propensity to deny from day one, if you look at the scheme of things in this, what you have is evidence you must accept. Once you accept it and apply it to the facts of this case, you have an individual for whom there was an immense vocational workup. He had to gappy. He had like the Purdue pegboard. He had all these small objects handling things. They reviewed the issue of sit-stand, which is – which erodes the occupational base. There were no jobs, as offered by the V.E., that could be substantiated because they were false. It's almost offensive. It makes me angry to think that people will come in and lie in these hearings when brought in by the ALJ. The deceased is only entitled to this disability benefit if he can do no work in the national economy. That's correct. It's not sufficient if he can't do the work he'd prefer to do or the work he used to do. I understand that. Right. So – and my problem with your case is simply that we're not reviewing a decision denying benefits that's been upheld. We're reviewing a decision of the district court saying there's some mistake here. It's got to go back and be done right. And I think the standard for that issue is abuse of discretion. So for you to win, you've got to persuade us that it's not feasible for the district court to take that approach and send it back. I don't understand the basis for that position. Because the district court – I understand what the district court was doing. But when the district court looks at this and says, but the ALJ said, that doesn't support the record. The record does not support the ALJ. It does not support the Commissioner. It supports the claimant. I agree with the standard. Can the claimant do any other job available in the national economy? But when you determine he can't do any other job and you have to resort to a vocational expert, then what you have is a vocational expert who on behalf of the Commissioner says he can do X, Y, Z jobs. Every single job was refuted. And for the workers' comp claim, there was an immense amount of vocational information that showed he can't do it, he doesn't have the physical capacity to do it. His doctor said it. Even a panel doctor said, well, if you could show me a job. Can I ask you one other question? In the – in addition to the errors that the government's already conceded and the district court has acknowledged, are you also attacking the ALJ's rejection of the treating physicians' determinations? Yes, because it's very clear that the treating physicians' – So that whether the district judge was right or wrong in not awarding benefits based on the errors that it was aware of, if you're correct about other errors, then it would – we're reviewing a different set of errors, more errors than the district judge found when he decided not to award benefits. I think we are. I think that the district court has overlooked – And we also have standards, don't we, about when we award benefits and when we remand. And the question is whether the district judge followed the right standard as to when benefits should be awarded or whether he made an error in applying the standard, which would constitute an abuse of discretion. And that's our belief, that the error was that the remedy should have been reversal but for benefits, not for a new hearing. I'd like to reserve my time. Thank you. Thank you. Good morning, Your Honors. My name is Stephanie Martz on behalf of the Commissioner of Social Security. The only matter here under review is whether the magistrate judge's decision to grant the Commissioner's motion to remand for further proceedings due to errors in the ALJ's decision was an abuse of discretion. Actually, it was the district judge. Yes. Affirming the – correct. This court came up with the abuse of discretion standard in Harmon v. Apfel. And in Harmon, this Court said that this kind of review for abuse of discretion was characterized as tolerance for the choices made by the district court. It also stated that an abuse of discretion – But if the district court didn't find all the errors when it exercised whatever discretion it may have, then we're not really reviewing the same exercise that the district judge went through. True. But in Harmon, this Court didn't feel the need to reach all of the errors that were identified by the claimant in that particular case. It looked at the district court's decision and stated that on the basis that the district court stated, which was an error on rejection of a – Well, did it say that even though the district – the ALJ made dozens of other errors, it wouldn't bother to look at them? Correct. They said basically that the district court, based on the error that they were focusing on, did not abuse its discretion in remanding on the basis of that error, and therefore they didn't need to reach – And it said you couldn't reach other errors that the district court didn't recognize? It didn't say it could not. It said it didn't need to. Well, I can't imagine why we would want to keep sending things back repeatedly and denying people benefits they're entitled to while judges and administrative officers keep making errors, and we – I can't imagine we would say we shouldn't look at them, if in fact, on the record, he is entitled to receive his benefits. If that would be – whether that would be an abuse of discretion or not. And the question is here – Well, a legal error is an abuse of discretion, the Supreme Court says. True. Okay. So let's just assume for the moment that in addition to the errors the government was gracious enough to acknowledge, there are other errors that the district judge made an error in not recognizing. Okay. We're not prohibited, I gather, from what you say, from saying, yes, there are other errors also. And when you take those errors into account, under our standard, the person's entitled to benefits. True. You could look at the other errors. But, again, we're reviewing the district court's decision to see if it was abuse of discretion. So you'd have to – in order to find that she abused her discretion, she hadn't made any findings on any of those errors that – under a prior precedent of Hayes v. I would think the government would want to see the people who need benefits and are entitled to them could get them without having to go back three times to administrative law judges who don't seem to follow the law. The government does wish for people who are entitled to benefits to get them. So we should look to see whether he's entitled. You could certainly do that. Although in Harmon, the court didn't feel it was necessary to review the district court's decision for an abuse of discretion. Well, I think I'm going to look at whether I think it's an abuse of discretion to go back. So we may have to look at a different understanding of Harmon here. But I think it's best for the panel if you do address the other issues that are of concern to Judge Reinhart. Specifically, the other issues that the appellant has raised have to do with the treating physician's opinion, which the commissioner did not concede errors on, which the ALJ rejected because of the conflicts that it was – it was internally inconsistent and was not supported by objective medical evidence. And Dr. Tullis, from 19 – January 1993 to February 1996, stated on eight separate occasions that Mr. Silva could perform sedentary employment. At the end, he said he couldn't. At the end. But he gave no reasons for his change in opinion. And he – there was no objective medical evidence that he based that change of opinion on, which is why the ALJ rejected it. The ALJ has the entitlement to reject an opinion of the treating physician that's inconsistent with his treatment – his or her treatment notes and prior opinions, correct? Correct. So that's what – all that happened here. Well, all that happened here is a person had a progressive disability and he got worse toward the end, which is not such a surprising event. The ALJ felt, as the fact finder, that the contradictions and the conflicts and the doctor's opinion and the lack of explanation and lack of any objective medical support for that opinion is not objective medical support. The ALJ was wrong about almost everything he did in this case, twice. Why would we think he would be right this time on what issue? On the – on the treating physician issue? Yes. The commissioner does not concede error on the treating physician. I understand that. I mean, it's very unusual. This is actually the first case I've seen where the commissioner has conceded error and has acknowledged that the ALJ has been as wrong as this one has been consistently. It's probably unusual for this Court because these cases don't make their way up, but it is a quite frequent occurrence in our office to review decisions and when there are errors, to the best that we can, to seek remand back to the agency so that a correct determination may be made by the fact finder. Let me ask you this. How much money is at stake? I mean, the claimant is now deceased. Exactly. So what amounts then to, of course, a closed period? Right. He applied in his alleged disability back to 1992. I believe he applied in approximately 1993. I don't know the exact amount. I'm not sure what his payment would have been, but you're looking at that roughly up until 2001. From what date? His alleged disability date was 1992, and I believe he applied sometime in 1993. So we're looking at roughly eight, nine years' worth of... Roughly, correct. And he died after the briefing was completed in this case? I believe the briefing was pending before this Court. He did die, but I'm not sure what his cause of death was. So all the decision makers up to this point were deciding the case with Mr. Silva still living? Right. The reason I go into this is there comes a point at which if there's a finite amount of money, it's not worth fighting about anymore, and I'm wondering whether that's a consideration as to whether or not to send it back for one more round. We're not now talking about a 45-year-old man who may live for another 30 or 40 years with these benefits. We know roughly how much they're going to be. You didn't give me a number, but you gave me a time frame so we can kind of figure it out. Should that make a difference in the calculation as to whether it's worth it to send it back? Should that be part of the discretionary calculation of the district judge? No, I don't believe so. Basically, the statute doesn't give us that sort of leeway. The statute says either you are disabled or you're not. No, I'm not asking what it gives to you. I'm asking as I evaluate the decision of the district judge, would that have been an appropriate consideration for the district judge to use, and then as we evaluate the exercise of his discretion as to, you know, listen, if it was certainly for 25 cents to send it back for an administrative proceeding, it's going to cost $25,000. That'd be stupid. Now, of course, those aren't the numbers here in front of us. But is it appropriate to consider that equation? No, because under 405G, the decision has to be made based on the administrative record. And so that part of this case that happens after the decision is not really part of the equation. Now, you do, I assume, recognize we have a number of cases where we have ordered the benefits be given. I'm absolutely aware of those. And there's other cases, too. In which we remand. Right. And I could point to one. It depends on whether under the record when you give, correct the errors the ALJ made.  And then you look at the record, correct it. If the only result is benefits should be awarded, then we award them. That is true. And that is looking at the entire record. Yeah. And then based on this record as a whole, as identified by the district judge, it's not supported for payment of benefits. But we always have decisions by the district judge when we get an appeal where we're being asked to say the district judge was wrong. And we do that. And then we award benefits when the record correcting the error made by the ALJ and the district judge. In those cases, I guess, are you talking about when the district court judges affirms the decision? Yeah. True. And that's a de novo review. In this case, we're doing an abuse of discretion. Well, that's based on the fact that we're only reviewing the errors in which he found, which the district judge found. And then said based on these errors, I would remand. But we're reviewing more errors than that. If we go further into the record, didn't the treating physician say that Mr. Silva was capable of working as a telemarketer, but he just didn't want to do it? Yes, he did make that statement. He said that he was capable of working as a security guard. I guess he didn't want to do it. He had more interesting jobs before. Right. And he said some other doctor said that he was negative about getting rehabilitation and wanted to be, wanted to have a pension. Right. In fact, I think that was Dr. Fay who characterized it that he was being groomed for a pension by his lawyers. Well, if we were to act like a social security board here instead of just reviewing for abuse of discretion, isn't the evidence such that the proper decision would be to say that although it's unfortunate Mr. Silva had this problem, there was work he could do in the national economy and he wasn't entitled to the benefit? That seems to be where the evidence is pointing. Yes, I mean, if you look at all the doctors' opinions, including most of the information up until the very final, you know, February 1996, is doctors saying he can work. The examiners who are doing evaluations are saying he can do some type of work. Most, most of the evidence points to not disabled other than Mr. Silva's testimony. Well, other than Mr. Silva's in the lay testimony, there's lots of that. Well, the lay witness testimony amounts to his neighbors saying that he knows that Mr. Silva's in pain, that he, I think, drapes his foot when he walks. And they do the chores for him and that he did the chores for him. But none of that actually necessarily establishes that he can't do any work. A lot of people who can't do certain chores can do some work in the national economy. My husband's a person. I'm not going to follow up on that. I see that I'm over my time. If there's no other questions, I'll sit down. Thank you. I think if I can beg the Court's indulgence and have an extra minute, I think that the could you try to speak a little louder? All right. I think the government ran about a minute 20 over. I'm just wondering. Don't worry about the time. Just tell us what you. All right. On the page 14 of our brief, we address the Harmon standard because the year after Harmon in Mays v. Messonnieri, as I recall, the decision seemingly held that even an order reversing denial of benefits may be reviewed de novo. It seems to me that there's some aspect of the ability to look at this de novo. We do have different issues. The district court, what happened is the U.S. attorney tried to short-circuit the process by pulling the plug before it became an expensive aegis problem, so they moved for remand. And we took the position that, okay, they've conceded error, but the remedy should be reversal. The Coon case, of course, in the U.S. Supreme Court was the issue of that there's an abuse of discretion when there's an error of law. I want to explain something to the one justice. The doctor, Mr. Tullis said he didn't think this man could do the telemarketing issue because of the sit-stand issue. And it was also clear that in looking back, in the 1995 hearing, the very first one in which we actually had a medical advisor, the medical advisor said this man has a failed back. He's going to have problems sitting in any particular position. The – this individual went out and tried. He later went when he was released. And under Cox v. Califano, being released to try a rehabilitation or to make an effort at a job is not the same thing as being released as not having a disability. It's sort of give it a shot and see how it goes, 1978 case, Cox v. Califano. So this gentleman went out and he tried.  He wanted to get a degree. He had like $500 or $800 into this class for doing it. One of his witnesses was Stephen Coffman. Stephen Coffman had been a prior claimant. He had been a window washer who had suffered an injury, I think, and one of those window carts fell, testified at – he was my former client, so I recall, but he testified at the hearing because he was a friend of the claimant. And they were both in the security guard class. And he pointed out that this individual had a problem. He couldn't get in and out of the car – out of the car as well. He could not perform the job. He wanted to go into a job thinking he could go, because he had been a drywall worker, that he could go out and he could do something and not be disabled. Then the issue of telemarketer came up, and his doctor, Tullis, said, no, I don't think he can do it. I think there will be a problem. And that was covered extensively by Ms. Cohen. Ms. Cohen, unlike the V.E. that came to the hearing, administered a number of tests, reviewed the medical records, got very deeply into this, and was doing it because their firm does a lot of workers' comp work. The – I have a quote from Dr. Tullis, and maybe he said something else later, but it's at the transcript at 241, saying Silva is, quote, definitely capable of working as a telemarketer, but he is not too pleased with this concept. So did the doctor not say that? I'm not sure, you know, without looking at whether or not – is that in one of the tabs? Yeah. I've got TR241. Is there a tab number for that? Or are you looking at the – Mine starts at 294 for that tab. So it's – oh, wait. Let's see if I have it. No, I have it at the order – oh, here, 241. Well, I'm looking at page 241. It says, at this point, I think we should take him out of the training program and have him consider other options. I'll see him back in clinic. Returns to clinic. I do not believe he's going to be able to perform all the duties and activities required of a security guard. And I also feel he's not capable of working as anything really more vigorous than that. He's capable of working as a telemarketer, but he's not too pleased with the concept. Then what happens is the doctor – So right there. Okay. Did he say – Okay. But he's – Did he add the word definitely in there? Okay. I'm just asking you. What you just read. Okay. I will concede that – Did he say he is definitely capable of working as a telemarketer, but is not too pleased with this concept? And that's in 1994. Okay. So that's his own doctor saying that. I understand that. But what you have to look at is that the doctor is not making the vocational assessment of – Well, do you know what the doctor said three months later when he said he's not able to do any gainful employment at any point? Right. And that's – basically, it ultimately concludes that they try these things – He's not going to do well no matter what he does. And Social Security disability is probably the most reasonable option for him. That was three months later, wasn't it? And it also explains why the claimant was frustrated. People said they wanted to do head shrinking, which didn't make sense because he had a back problem. And he went, and why am I here? This is my back. But they did say three months later that he's not able to do any gainful employment at this point. No, I – Said the doctor, didn't he? No. And I agree that that's the case. And that's one of the reasons why we look to the treating physician. I know. And then the ALJ discounted the treating physician's diagnosis. I mean, they kind of are both ways. It's not both that the treating physician said he could work and that we should discount the treating physician. The treating physician concluded that he couldn't work. And then the ALJ says, well, he doesn't believe the treating physician. Well, that's our problem, is that I don't think this ALJ would have believed anybody associated with this claimant. He just wouldn't have. He took the position off the bat. He went – if you look at the original appeals counsel remand based on the judge's first decision, the judge went as far out as he could through any circuit to find rules that he could use. And he rejected the treating physician's analysis or diagnosis because the treating physician accepted the subjective pain testimony. And that's what we're left with under Varney, is at some point we have to decide if the judge can give a reason for disregarding the subjective testimony. And this judge says, I find the test impractical. I don't want to apply it. Don't make me do it. This is a judge who, extraneous to this record, has been told by Social Security to go follow fibromyalgia cases because he didn't – he didn't want to acknowledge them. This is a judge – this is Judge Defloff. He is a problem judge, which is why we wind up in this Court frequently. If this gets remanded, I gather that the government has agreed that it goes back to a different ALJ. Well, they have to because the HALEX rule requires it. And I did want to answer one thing before I forgot. I didn't ask whether they had to, but I understand. If it goes back, it goes back to a different ALJ. It must. Yes. But it's sort of gratuitous because they'd be required under the rules for the hearings. I did want to point out, the gentleman testified in the first or second hearing that he was getting $2,000 a month for workers' comp. That means that the amount at issue – and this case infuriates me, so it's here because it's wrong. But the amount at issue is going to be nominal because there's going to be a workers' compensation offset. What does nominal mean? Roughly speaking. I mean, we may be down to a few hundred dollars a month. You know, it's not going to be whatever his maximum would have been. $200 a month over how many months? Well, over the date of onset is, I think, April of 1993. So we're not talking necessarily $900 or $1,200 a month. We're probably talking maybe $400 or $300 a month. We're talking a reduced amount because Social Security must do a calculation and take into account. So the injustice is heightened for a lesser amount. See, had we succeeded, this gentleman would have been getting workers' comp but would have had no medical care, and the fight would have been to make sure he got benefits and got Medicare. Now all I can do is get his heirs the underpayment based on the fact that he was never home. The total amount – I mean, just a quick little math. The total amount at stake here is, what, $30,000, $40,000? It could be. I cannot give a specific amount. I can only tell you that it's been significantly – it will be significantly reduced because of the workers' comp offset that has to be applied. Thank you. Thank you both very much. The case just argued will be submitted. The next case on the calendar is Haugen v. Brasso. Thank you.
judges: Reinhardt, W Fletcher, Gould